# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| TONIA STRICKLAND, | ) | CASE NO. 3:20-CV-01412 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| ANDREW SAUL, | ) | |
| *Comm'r of Soc. Sec.*, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Tonia Strickland (Plaintiff), challenges the final decision of Defendant Andrew Saul, Commissioner of Social Security (Commissioner), denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 et seq. (Act). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.     Procedural History

Plaintiff previously applied for Title II and XVI benefits on June 7, 2013, which resulted in an unfavorable decision by an Administrative Law Judge (ALJ) on August 17, 2016. (R. 10, Transcript ("Tr.") 203). The Appeals Council (AC) denied her request for review, and she appealed the matter to the U.S. District Court, which affirmed the Commissioner's decision. (Tr. 250).

Plaintiff submitted a new application for DIB and SSI on October 17, 2017, alleging a disability onset date of June 12, 2013. (R. 10, Transcript ("Tr.") 381-399). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an ALJ. (Tr. 128, 153). Plaintiff participated in the hearing on March 18, 2019, was represented by counsel, and testified. (Tr. 59-104). A vocational expert (VE) participated and testified. *Id*. The ALJ rendered the decision on May 6, 2019, concluding that Plaintiff was not disabled (Tr. 12-31), and also determining that because Plaintiff did not submit evidence that warranted a change in the previous decision, she could not be found entitled to benefits prior to August 18, 2016, the day after the last decision was issued. (Tr. 15).

On April 30, 2020, the AC denied Plaintiff's request to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-6). Plaintiff's complaint challenges the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 13, 16, 17).

## II.     Evidence
###      A.      Relevant Medical Evidence[1]
####           1.      Treatment Records
#####                a)      Physical Impairments

Prior to her disability onset date of August 18, 2016, Plaintiff's physical issues included carpal tunnel, episodic syncope and migraines. Plaintiff had carpal tunnel release surgeries in 2013 (right hand) and 2016 (left hand), followed by "significant improvement in her symptoms." (Tr. 1681). Plaintiff also had two-to-three "passing out episodes" (the syncope episodes) in the

---

[1]  The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and also deemed relevant by the court to the assignments of error raised.

three years prior to her disability onset date. (Tr. 611; *see also* Tr. 763).

Regarding her syncope, the record supports Plaintiff's explanation that "she had neurocardiogenic syncope. A loop recorder was implanted in November 2016 (Tr. 689). She is followed regularly by a cardiologist, but there have not been any syncopal episodes since the recorder was implanted (Tr. 571)." (R. 13, PageID# 1795).

Plaintiff's arguments regarding the ALJ's treatment of her physical impairments relate to her migraines and carpal tunnel issues. On August 25, 2016, Plaintiff began treating with neurologist, Dr. Peter Zangara, to investigate her migraines and syncope. Her treatment records with Dr. Zangara regarding her migraines are summarized as follows:

| Date | Summary | Tr. |
|------|---------|-----|
| 8/25/16 | **Plaintiff Reported**: migraines roughly once every two weeks, with each one lasting five or six days, with the average pain being a ten on a scale of zero to ten. Often will go to the emergency room for headache treatment, which usually works. **On examination**: no neurological deficits: intact memory, no confusion, normal sensation, full strength, proper gait and intact fine motor skills. **Treatment:** replacing medications with Depakote and over the counter Magnesium Oxide. Referred to cardiology to investigate syncope. | 1081-84 |
| 10/27/16 | **Plaintiff Reported:** migraines unchanged but had not fully implemented the medication changes previously advised. **On examination:** mild signs of headache distress, but otherwise normal findings. | 1056-65 |
| 1/4/17 | **Plaintiff Reported**: much less headache distress but is not yet headache free. **On examination:** appeared stable neurologically. **Treatment:** increased Depakote dose | 1037-48 |
| 4/27/17 | **Plaintiff Reported**: much less frequent headache distress. **On Examination**: unchanged, normal physical findings. **Treatment**: no medication changes. Plaintiff to return only for semi-annual evaluations as long as she remained comfortable and stable | 1018-36 |
| 11/2/17 | **Plaintiff Reported:** overall pleased with headache management. **On Examination**: normal physical and neurological findings. **Treatment**: no changes. | 999-1017 |
| 11/8/17 | Plaintiff called regarding sharp pains intermittently in the sides of her head or forehead, different than her migraines. **Treatment**: advised to slightly increase Depakote and supplement with Aleve. | 998 |

3

On February 20, 2018, Plaintiff treated with Dr. Kanchan Pillai, regarding her history of mild persistent asthma and for a regular health maintenance check. (Tr. 1448). Plaintiff reported she was doing well with her asthma, with no ER visits or hospital admissions. (*Id.*). Plaintiff reported she was not taking her prescribed migraine medication because she was concerned it would affect her blood pressure. (*Id.*). Dr. Pillai instructed her to take the medication and to monitor her blood pressure. (*Id.*).

By May 2018, Dr. Zangara retired, and Plaintiff began treating with neurologist Dr. Carmela Gonzales. Dr. Gonzales' treatment records are summarized as follows:

| Date | Summary | Tr. |
|------|---------|-----|
| 5/3/18 | **Plaintiff Reported**: Developed hair loss on Depakote and was switched to verapamil. Took verapamil for 2-3 months with no relief and decided to stop taking it due to low blood pressure. Headache frequency 6/7 days per week, 6 hours. Triggered by sleep deprivation. **On Examination**: Normal. **Treatment**: Switch daily medication to amitriptyline and rescue medication to Maxalt. Follow up in 6 weeks. | 1598-1610 |
| 6/20/18 | **Plaintiff Reported**: Headaches 2-3 a week down from 6-7 days per week. Severity 8/10. No new complaints. **On Examination**: Normal. **Treatment**: Increase daily medication, continue with rescue medication. Follow up in 3 months. | 1585-1597 |
| 8/15/18 | **Plaintiff Reported**: Headaches 2-3 times a week, severity 8/10. Triggered by weather changes. No new complaints. **On Examination**: Normal. **Treatment:** Increase medication and switch rescue medication for one with a faster onset. Follow up in 6-8 weeks. | 1570-1584 |
| 9/28/18 | **Plaintiff Reported**: Down to one headache a week, Severity 8/10. Medication does not affect her ability to function. Triggers include weather changes and stress and are relieved by rest and exacerbated by loud noise. No new complaints. **On Examination**: Normal. **Treatment**: Continue current management and follow up 6-9 months. | 1557-69 |

On September 21, 2018, Plaintiff treated with Dr. Glenn Rotthaas regarding wrist pain. (Tr. 1667-70). Plaintiff had a CT scan on her wrists on September 27, 2018, which showed unremarkable results. (Tr. 1530-1531). On October 25, 2018, Plaintiff followed up with Dr.

Rotthaas, who referred Plaintiff for an orthopedic consultation regarding bilateral carpal tunnel. (Tr. 1663-1666). Plaintiff saw Dr. Rotthaas on December 5, 2018, and the doctor noted that an EMG conducted on October 15, 2018, showed "mild right median neuropathy at the wrist is sensory consistent with residual carpal tunnel syndrome" but "no evidence of right cervical radiculopathy or brachial plexopathy." (Tr. 1662). Dr. Rotthaas referred Plaintiff to a pain management consultation. (Tr. 1662).

On December 17, 2018, Plaintiff saw Dr. Pillai for health maintenance (Tr. 1640-52) and reported she was "doing well." (Tr. 1649). Her migraines and asthma were "stable," and she was following up with orthopedics for her right wrist pain. (*Id.*). Physical examination findings were normal. (Tr. 1650-51).

On January 24, 2019, Plaintiff consulted with Dr. Rashid Khalil for pain management. (Tr. 1681-86). Plaintiff reported that she had significant improvement following her carpal tunnel surgeries in 2013 and 2016, but that her symptoms had recently returned in her right hand. (Tr. 1681). The pain was aggravated with use, such as writing and typing, and it woke her up at night. (*Id.*). Plaintiff indicated that due to the risk of hypotension and worsening of her syncope, she was not interested in long-term medication management. (*Id.*). Dr. Khalil prescribed Neurontin and noted that Plaintiff could benefit from carpal tunnel release surgery. (Tr. 1686). He advised her to follow up with her surgeon. (*Id.*).

### b)     Mental Health Conditions

Regarding her mental health impairments, Plaintiff underwent regular counseling sessions with Donna Close, MSW, LSW, starting in October of 2015. (Tr. 977). She was diagnosed with Major Depressive Disorder-recurrent Episodes. (Tr. 977). Plaintiff met with

Donna Close a least monthly from September of 2016 through October of 2018. (Tr. 900-965, 1382-1399, 1490-1513). Her initial therapy objective was to learn three to five self-management skills necessary to cope with her physical and mental health conditions, which transitioned into utilizing one self management skill per day to help cope with her depression and stressors. (*See*, Tr. 916, 924). Throughout these sessions, Plaintiff presented with a depressed mood, but was alert, with intact memory and adequate concentration. (*See generally*, Tr. 900-65, 1382-99, 1490-1513).

On December 18, 2017, Plaintiff underwent an initial psychiatric evaluation with Kelly Kingsley CNs. (Tr. 1392-94). Plaintiff reported that she attended therapy every two weeks and did not want medication. (Tr. 1392). She reported variable (up and down) mood, problems dealing with other people, irritability, anxiety attacks, crying spells, and sleeping problems. (*Id.*). On examination, Plaintiff was "a little agitated" and got easily frustrated, but she was well groomed, with fair eye contact, future-focused, logical and organized thoughts, average intelligence and no deficits in memory, attention or concentration. (Tr. 1393). Plaintiff was diagnosed with major depression and ruled out bipolar disorder and anxiety disorder. (*Id.*). She was offered medications but refused any at that time. (Tr. 1394).

Plaintiff met with psychiatrist, Dr. Edwin Walker, in May and June of 2018 and he prescribed a low dose of Effexor. (Tr. 1511-1514, 1405). Plaintiff's psychiatric care was transferred to Dr. Satwant Gill in July of 2018, after Dr. Walker left the practice. (Tr. 1405-06). Dr. Gill counseled Plaintiff on treatment options, but Plaintiff wanted to continue Effexor because she was "doing well with the medicine." (Tr. 1406). On examination, Dr. Gill found no abnormalities, aside from mildly labile mood. (*Id.).*

Plaintiff returned to see Dr. Gill on August 2, 2018 and reported that she was "doing fairly well." (Tr. 1402). Her mood was "stable," and she did not want any medication changes (*Id.*). Plaintiff continued this treatment through October and December 2018. (Tr. 1711-17). At her December appointment, Plaintiff reported that she had a "good Thanksgiving" and denied any current depression, mood swings or side effects from her low-dose Effexor. (Tr. 1715).

Plaintiff had her last counseling session with Donna Close on November 8, 2018. (Tr. 1701). On December 21, 2018, January 11, 2019, and January 29, 2019, Plaintiff counseled with Lynn Ghesquire, MSW, LISAW-S, LICDC. (Tr. 1699). She presented with a stable mood.

### 2.  Medical Opinions Concerning Plaintiff's Functional Limitations

On December 7, 2017, State Agency physician Dr. Gerald Klyop reviewed the evidence to assess Plaintiff's residual functional capacity (RFC). (Tr. 121-23, 170-72). Dr. Klyop concluded that Plaintiff could lift/carry 20 pounds occasionally and ten pounds frequently; sit six hours and stand/walk six hours in an eight-hour workday; only frequently push/pull with her arms; frequently engage in fingering and handling activities; occasionally balance, stoop, kneel, crouch, crawl or climb ramps and stairs, but never climb ladders, ropes or scaffolds; and that she needed to avoid concentrated exposure to pulmonary irritants and even moderate exposure to hazards (*Id.*). On February 4, 2018, State Agency physician Dr. Maureen Gallagher concurred with Dr. Klyop. (Tr. 170-72).

On December 7, 2017, State Agency psychologist Dr. Courtney Zeune assessed Plaintiff's mental functions. (Tr. 118-19, 123-25). Dr. Zeune concluded that Plaintiff was moderately limited in each of the paragraph B criteria—understand, remember or apply information, interact with others, concentrate persist or maintain pace, and adapt or manage

oneself. (Tr. 118, 167). Dr. Zeune opined that Plaintiff could understand and remember short repetitive tasks; perform such tasks in a setting with flexible pace and production requirements; interact superficially with a small group of coworkers in a setting with infrequent public contact; and adapt to a routine work setting where changes are infrequent. (Tr. 124-25, 173-74). On December 29, 2017, State Agency psychologist Dr. Lisa Foulk also reviewed Plaintiff's mental functions and concurred with Dr. Zeune and her assessment. (Tr. 167, 172-74).

### B.     Relevant Hearing Testimony

During the March 18, 2019 hearing, Plaintiff testified as follows:

- She was 51 years old and between addresses. (Tr. 71). She has a high school degree and a state trained nurses' assistant (STNA) certificate. (Tr. 76). She experienced pain, numbness, and weakness in her hands and right elbow, and migraine headaches, which impacted her ability to work. (Tr. 83-84). She classified her pain as a ten out of ten, and indicated she was allergic to her prescribed pain medication. (Tr. 85). She attended physical therapy but did not find it helpful. (Tr. 85). She needed an additional surgery on her right hand (Tr. 86).

- She had migraines two weeks of every month; and if her medicine did not work, she went to the Emergency Department (ED). (Tr. 86). She had not gone to an ED in about two years. (Id.). She testified that all her medications caused side effects. (Tr. 87).

- Plaintiff estimated that she could walk a mile, sit for two hours, and stand for an hour. (Tr. 88). It was difficult carrying groceries and she was unable to pick up a gallon of milk with either hand. (Id.). She noted memory issues, confusion, and trouble concentrating. (Tr. 88-89). She had problems getting along with people and if someone kept agitating her, she screamed at them. (Tr. 90). She has no difficulty making decisions. (Id.). She could bathe and dress herself and use a cell phone until her hand became numb. (Tr. 91). She has trouble sleeping but did not nap during the day. (Tr. 90). She had difficulty doing most household chores but could make a simple meal. (Tr. 92).

- Plaintiff has not had an issue with syncope since the tilt table test in June of 2017. (Tr. 95). She saw a psychiatrist every six months and her therapist every two weeks. (Id.). She thought her condition was worse than at her previous hearing because she was depressed about everything; she noted no income and that she became sad and cried almost every day. (Tr. 96).

During the administrative hearing, the ALJ noted that Plaintiff's past work included jobs as a machine operator, lens inserter, and a daycare provider. (Tr. 81-82). The ALJ posited the

following hypothetical question to the VE:

> The individual could perform at the sedentary level of exertion – I'm sorry at the light level of exertion with the following limitations: Occasionally climb ramps and stairs, never climb ladders, ropes of scaffolds, occasionally stoop, kneel, crouch and crawl, frequently exercise foot controls with the bilateral lower extremities, frequently push, pull, handle, finger and feel with the right upper extremity, never be exposed to concentrated levels of fumes, odors, dust, gases, poor ventilation or other pulmonary irritants, never be exposed to hazards such as moving machinery and unprotected heights. The individual can perform simple, routine and repetitive tasks but not at a production rate pace. So, for example, no assembly-line work. The individual can respond appropriately to occasional interaction with supervisors and coworkers, but with no interaction with the general public. The individual is limited to tolerating few changes in the work setting defined as routine job duties that remain static, performed in a stable predictable work environment. Any necessary changes need to occur infrequently and be adequately and easily explained.

(Tr. 99-100). The VE testified that such a person could not perform any of Plaintiff's past work but could perform the following representative jobs: merchandise marker with Dictionary of Occupational Titles (DOT) 209.587-034 and an estimated 280,000 jobs in the national economy, office helper DOT 239.567-010 with an estimated 70,000 jobs in the national economy, and sorter DOT 222.687-014 with an estimated 70,000 jobs in the national economy. (Tr. 100-101).

The VE testified the tolerance for being off task was ten percent of the work period and the tolerance for absences was one day per month. (Tr. 101). In response to questioning by Plaintiff's counsel, the VE further testified that there were no jobs for an individual who was right-hand dominant and could only occasionally use their right upper extremity for grasping and handling. (Tr. 103).

## III.    Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health*

9

*& Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

### IV.    Summary of the ALJ's Decision

1) The claimant meets the insured status requirements of the Social Security Act through March 31, 2017.

2) The claimant has not engaged in substantial gainful activity since August 18, 2016, the earliest established alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3) The claimant has the following severe impairments: asthma; major depressive disorder, recurrent, severe; anxiety; carpal tunnel syndrome, right wrist; and, status postcarpal tunnel syndrome surgery, bilateral (20 CFR 404.1520(c) and 416.920(c)). The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

4) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can: only occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally stoop, kneel, crouch and crawl; frequently exercise foot controls with the bilateral lower extremities; and, frequently push/pull, handle, finger, and feel with the right upper extremity. She can never be exposed to concentrated levels of fumes, odors, dusts, gases, poor ventilation, or other pulmonary irritants; and, never be exposed to hazards such as moving machinery and unprotected heights. She can perform simple, routine and repetitive tasks, but not at a production rate pace so, for example, no assembly line work. She can respond appropriately to occasional interaction with supervisors and coworkers, but with no interaction with the general public; and is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work environment; any changes need to occur infrequently and be adequately and easily explained.

5) The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

6) The claimant was born on *** 1967 and was 49 years old, which is defined as a younger individual, on the established alleged onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

7) The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

8) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

10) The claimant has not been under a disability, as defined in the Social Security Act, from the established alleged onset date of August 18, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18-31).

## V.    Law and Analysis
### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial

evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.    Plaintiff's Assignments of Error**
**1.    Plaintiff's First Assignment of Error**

Plaintiff's first assignment of error is framed as a general challenge to the ALJ's evaluation of the totality of the evidence. Although she suggests the ALJ failed to properly evaluate the totality of the evidence, this general assignment of error addresses several arguments challenging the ALJ's determinations as Steps Two and Three of the sequential analysis and also assessment of certain medical opinions.

**a)    Step Two: The ALJ Determined Plaintiff's Migraines were Non-Severe**

Plaintiff contends that "the ALJ erroneously disregarded Strickland's migraines and found that they were a non-severe impairment." (R. 13, PageID# 1808). The Commissioner contends that any error to identity an impairment as severe at Step Two "is harmless because the ALJ moved past step two and considered all of plaintiff's impairments at each subsequent step of the sequential evaluation process (*see generally* Tr. 21-29)." (R. 16, PageID# 1840). The Commissioner has the stronger argument and Plaintiff's assertion does not provide a basis for remand.

As defined by Social Security regulations, a "severe" impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). "At step two 'significant' is liberally construed in favor of the claimant[, but] [t]he regulations provide that if the claimant's degree of limitation

is none or mild, the Commissioner will generally conclude the impairment is not severe." *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 428 (6th Cir. 2007); *see also* 20 C.F.R. § 416.920a(d)(1) ("If [the Commissioner] rate[s] the degree of limitation as 'none' or 'mild', [the Commissioner] will generally conclude that [the] impairment is not severe..."). The Sixth Circuit Court of Appeals has construed Step Two's severity requirement as a "de minimus hurdle." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n. 2 (6th Cir. 2007).

Here, the ALJ's step two analysis designated several impairments as severe, including the following: asthma; major depressive disorder, recurrent, severe; carpal tunnel syndrome, right wrist; and, status post-carpal tunnel syndrome surgery, bilateral. (Tr. 18). While the ALJ did not designate Plaintiff's migraines as severe, failure to do so is harmless. Because an ALJ must move on to the subsequent steps in the sequential evaluation if only one impairment is found to be severe, an ALJ is not required to analyze the remainder of a claimant's impairments to determine whether they are also severe. *See, e.g., Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008) ("The fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant" ) (*citing Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987) (same) holding that the failure to find that an impairment was severe was harmless error where other impairments were deemed severe); *Nejat v. Comm'r of Soc. Sec.*, 359 Fed. App'x. 574, 577 (6th Cir. 2009) (same); *McGlothin v. Comm'r of Soc. Sec.*, 299 Fed. App'x. 516, 522 (6th Cir. 2008)). After the ALJ makes a finding of severity as to even one impairment, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5 at *14, 1996 WL 374184 at *5 (Jul. 2, 1996).

When the ALJ considers all of a claimant's limitations caused by both severe and non-severe impairments in the remaining steps of the sequential evaluation, the ALJ's failure to

designate an impairment as "severe" at step two does "not constitute reversible error." *Maziarz*, 837 F.2d at 244; *see also Nejat*, 359 Fed. App'x at 576-577. Plaintiff contends that "it is unclear if the ALJ accounted for the migraine headaches in her RFC" and therefore the matter should be remanded. (R. 13, PageID# 1810). There is no basis for this assertion, however. Rather, the ALJ mentions Plaintiff's migraines more than a dozen times in the underlying decision. (Tr. 19-28). For example, the ALJ stated: "The claimant filed for disability benefits, alleging an inability to work due to migraine headaches.… She further testified that she has migraines two weeks a month.… When the medication does not work, she has to go to the emergency room; however, she has not been to the emergency department for migraines for two years." (Tr. 24). Further, "while the claimant testified that her migraine medications make her feel 'out of it,' she has not reported that to her providers. On the contrary, she consistently reported to her neurologist having no side effects[.]" (Tr. 28).

The Commissioner correctly asserts that in Plaintiff's brief on the merits she does not point to any evidence suggesting that her migraines would result in limitations inconsistent with the demands of the RFC. (R. 16, PageID# 1840). Plaintiff's reply brief contends that "the State Agency reviewing physicians opined that the migraines were a severe impairment, but the ALJ failed to adopt this finding and failed to provide any substantial evidence to support her conclusion that migraines were not a severe impairment in this matter." (R. 17, PageID# 1849). She further contends that her testimony and treatment records establish that her migraines would result in missing more than one day of work per month, which would be work preclusive. (R. 17, PageID# 1849-50).

Plaintiff is correct that the State Agency reviewing physicians opined that her migraines were a severe impairment. (Tr. 118 duplicate at 143, 167 duplicate at 189). Indeed, the State

Agency physicians specifically considered and incorporated Plaintiff's migraines in their RFC analyses. (Tr. 121-22, 193). The ALJ explained that he found their opinions generally persuasive and adopted the limitations set forth therein while adding another limitation of frequent exercise of foot controls to fully account for her impairments. (Tr. 27-28). Despite the label of severe or non-severe, the ALJ considered Plaintiff's migraines when formulating the RFC. Finally, to the extent that Plaintiff's rely brief contends that her testimony and treating notes establish that she would be absent one day of work per month (R. 17 PageID# 1850), the court construes that as an undeveloped argument raised in the reply brief that also constitutes an improper invitation for the court to reweigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Plaintiff has not established designating her migraines as non-severe resulted in reversible error. *Vidot v. Colvin*, No. 1:14 CV 1343, 2015 U.S. Dist. LEXIS 79201, 2015 WL 3824360 at *2 (N.D. Ohio June 18, 2015).

### b) Step Three

Plaintiff asserts that the ALJ erred at Step Three by finding that her combined impairments did not meet a listed impairment. (R. 13, Page ID#1814). Specifically, Plaintiff contends that her psychological impairments met Listing 12.04. (R. 13, PageID# 1811, 1813). Although she mentions her physical impairments, she fails to develop an argument for anything other than Listing 12.04. (R. 13, PageID# 1810-11). *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432-33 (6th Cir. 2014) ("[T]he claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing.… Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at

Step Three"); *see also U.S. v. Catlan*, 499 F.3d 604, 606 (6th Cir. 2007) (undeveloped arguments are waived).

To meet Listing 12.04, the claimant must show she has a qualifying affective disorder that results in at least one extreme or two marked limitations in a broad area of functioning: 1) understanding, remembering, or applying information; 2) interacting with others; 3) concentrating, persisting, or maintaining pace; or 4) adapting or managing themselves (collectively referred to as the "paragraph B criteria"). 20 C.F.R. Pt. 404, Subpt. P, App.1, Listing 12.04. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. 20 C.F.R. Pt. 404, Subpt. P, App.1, Listing 12.00 (F)(2)(d). An extreme limitation means that the claimant is not able to function in an area independently, appropriately, effectively, and on a sustained basis. (20 C.F.R. Pt. 404, Subpt. P, App.1, Listing 12.00 (F)(2)(e).

Plaintiff contests the ALJ's conclusion that she was moderately limited in each of the paragraph B criteria. (R. 13, PageID# 1811). Her brief mischaracterizes the ALJ's discussion of the area of understanding, remembering, or applying information, asserting that the ALJ "concluded that since she could use a cell phone, she had no more than a moderate limitation in understanding, remember or applying information." (*Id.).* Rather, the ALJ considered a variety of evidence and did not merely rely on Plaintiff's ability to use a cell phone. In fact, the ALJ compared Plaintiff's statements in her Adult Function Report and in her testimony that she had memory issues with her treatment records where she reported no memory loss or confusion. (Tr. 21). The ALJ noted Plaintiff "reported to her therapist that she was having difficulty keeping track of her appointments, but that she was able to use her cell phone as a means to remember appointments and addresses (Ex. B4F, pp. 44 & 52)." (Tr. 21). The ALJ further noted that despite Plaintiff's reported memory issues to her therapist, Plaintiff's mental status examinations showed an intact

17

memory and her psychiatric evaluation in 2017 showed no reported or observed memory deficits. (Tr. 21-22). Further, Plaintiff did not report memory loss or symptoms of confusion to her neurologist. *Id.* Plaintiff does not contest these statements. (R. 13, PageID# 1811).

The ALJ concluded that Plaintiff had moderate limitations in the area of interacting with others. (Tr. 22). Pointing to Plaintiff's statements that she has difficulty getting along with others, the ALJ explained that the record shows she does show intermittent problems getting along with others. (Tr. 22). The ALJ discussed various records to support the conclusion that this problem is intermittent, noting that she has intermittent problems getting along with her daughter, but does not have problems getting along with her son. (Tr. 22). The ALJ noted that Plaintiff stated in her Adult Functioning Report that she spent time talking with others on the telephone, although the ALJ also not she reported difficulty being around other people and isolating herself. (Tr. 22). "By July 2018, [Plaintiff] reported to her psychiatrist that she only 'sometimes' becomes irritated if someone bothers her[,]" but that several months later she reported socializing with family and had a good Thanksgiving. (Tr. 22). Plaintiff over simplifies this analysis, by stating "[i]t appears that the ALJ is equating being with others and speaking to them only on the telephone as the same thing." (R. 13, PageID# 1811). Even a cursory review of the ALJ's decision shows that Plaintiff's brief takes the ALJ's statements out of context, and the argument is not persuasive. Moreover, Plaintiff has not contradicted the actual evidence cited by the ALJ.

Regarding adapting or managing oneself, Plaintiff attempts to overlook the entirety of the ALJ's analysis to focus on part of one sentence. (R. 13, PageID# 1811). Here, Plaintiff notes that the ALJ acknowledged the record showed she had intermittent problems with managing her anger, but then suggests the ALJ merely concluded "that since she was well groomed and dressed appropriately…she had no more than a moderate limitation in this area of functioning[.]" (R. 13,

PageID# 1812). In fact, the ALJ identified various records to establish that Plaintiff could recognize her emotional triggers to avoid them, and that she was able to maintain control over her anger by removing herself from difficult situations. The ALJ noted that she could handle a checking and savings account, could shower and dress herself, could go shopping and was well groomed and dressed appropriately. (Tr. 22-23). Plaintiff has not refuted this evidence relied upon by the ALJ.

Plaintiff points the court to a variety of counseling records indicating that they "present a different picture than as stated by the ALJ." (R. 13, PageID# 1812). But she does not develop this argument beyond mere conclusions. She asserts that "[t]he documented observations during counseling sessions describe a person with more limitations than opined by the ALJ. Strickland had a depressed mood, had memory issues, poor hygiene, was irritable, and complained of fatigue." (R. 13, PageID# 1812). Although Plaintiff cites to evidence in the record to support her view of the case, she does not contest the evidence relied upon by the ALJ. In other words, Plaintiff's argument challenges the weight of the evidence, rather than showing that the ALJ's decision was not supported by substantial evidence. If substantial evidence supports the ALJ's decision, the decision must stand even if the evidence could support an opposite conclusion. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *Her v. Commissioner*, 203 F.3d 388, 389-390 (6th Cir. 1999). The court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard*, 889 F.2d at 681. Plaintiff fails to establish that the ALJ's decision concerning the Paragraph "B" criteria was not supported by substantial evidence.

### c)      Medical Opinions

Plaintiff next points the court to regulations and law regarding the persuasiveness of medial opinions. (R. 13, PageID# 1814). However, Plaintiff does not apply this law to her case. Rather, she states "[i]n her decision, the ALJ found that there were opinions proffered prior to August 18, 2016, but they were not addressed as they were part of a previously adjudicated period (Tr. 27). Although these opinions were dated prior to the onset date in this matter, they still provided restrictions related to Strickland's impairments." (R. 13, PageID# 1815). Plaintiff contends that "[f]ailure to address these reports (Tr. 1718-1719, 1721, 1722) and provide a coherent explanation as to why they were disregarded was harmful error and should result in this matter being remanded." (R. 13, PageID# 1815). The ALJ, in fact, explained how she considered these opinions:

> As for medical opinion(s) and prior administrative medical finding(s), we will not defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from your medical sources. However, the undersigned has fully considered the medical opinions and prior administrative medical findings in your case as discussed below.
>
> The record also contains opinions prior to August 18, 2016, which were not addressed because they were part of a previously adjudicated period and were not probative to the period under review (Exs. B21F, B22F & B23F).

(Tr. 27). Plaintiff fails to support an argument that the ALJ erred by not addressing opinions that were part of a previously adjudicated period. Plaintiff does not cite any case law or regulations regarding the review of medical opinions prior to the period under review. Finally, Plaintiff does not explain how the limitations set forth in the medical opinions differ or are more limited than the RFC. The court cannot take such a conclusory and undeveloped assertion and transform it into a substantive argument on Plaintiff's behalf without improperly becoming an advocate for Plaintiff. "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997).

It is well established that "issues which are 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *Kennedy v. Commissioner*, 87 Fed. Appx. 464, 2003 WL 23140056, at *1 (6th Cir. 2003) (citing *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)) (rejecting perfunctory argument)). The court deems this undeveloped argument forfeited.

For the above reasons, the undersigned recommends that the first assignment of error be rejected.

### 2.      Step Five of the Sequential Evaluation.

In her second assignment of error, Plaintiff contends that the ALJ did not satisfy the burden at Step Five of the sequential evaluation. (R. 13, PageID #: 1816).

Once the ALJ determines claimant does not have the residual functional capacity to perform her past relevant work, the burden shifts at Step Five to the Commissioner to show that claimant possesses the capacity to perform other substantial gainful activity that exists in the national economy. *Wilson*, 378 F.3d at 548; *Varley v. Sec'y, HHS*, 820 F.2d 777, 779 (6th Cir. 1987). To meet this burden, there must be "a finding supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs." *Varley*, 820 F.2d at 779 (quoting *O'Banner v. Sec'y, HEW*, 587 F.2d 321, 323 (6th Cir. 1978)). The ALJ may rely upon the testimony of a VE at Step Five. "In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy*, 594 F.3d at 516; *see also Pasco v. Commissioner of Social Sec.*, No. 03-4358, 2005 WL 1506343, at *13 (6th Cir. June 23, 2005); *Varley*, 820 F.2d at 779 (citing cases).

Plaintiff specifically argues that the ALJ erred by not restricting her RFC to no more than occasional use of the right upper extremity. (R. 13, PageID# 1816). According to the VE, such a limitation would preclude all jobs. (Tr. 103). Plaintiff asserts that such a restriction "was supported by the October 15, 2018 NCT revealing findings consistent with residual carpal tunnel syndrome and with the sensory portion affected (Tr. 1730)." (R. 13, PageID# 1816). Plaintiff makes this summary conclusion without further explanation. Here, Plaintiff relies upon a nerve conduction study conducted on October 15, 2018. (Tr. 1730). The physician's interpretation is as follows: "Mild right median neuropathy at the wrist is noted consistent with residual carpal tunnel syndrome. Only the sensory portion is mildly affected. There is no evidence of right cervical radiculopathy or brachial plexopathy." (Tr. 1730). Plaintiff does explain why this record supports greater limitations than provided by the RFC and how the ALJ's decision constituted error.

Regardless, the ALJ discussed this record within the context of Plaintiff's medical history. The ALJ asserted:

> With respect to her wrist complaints, the record shows that the claimant treated with Dr. Glenn Rothhaas, for her bilateral hand complaints (Ex. Bl8F). The record shows a history of right carpal tunnel right in April 2013 and left carpal tunnel release in March 2016 (Ex. Bl 8, p. 14). Dr. Rothhaas ordered a bilateral wrist CT that was performed on September 27, 2018. The CTs showed no acute abnormality and visualized portions of the carpal tunnel and median nerve were unremarkable (Ex. Bl4F, p. 15). Although she denied symptoms on the left, a bilateral EMG/NCV was done on October 15, 2018 (Ex. B25F, p. 1). The testing showed findings consistent with residual carpal tunnel syndrome of the right wrist but that only the sensory portion was mildly affected. There was no evidence of right cervical radiculopathy or brachial plexopathy and the left studies were normal (Ex. B25F, p. 1). At a follow-up on January 4, 2019, Dr. Rothaas referred her to another orthopedic specialist for consult on her hands and scheduled the claimant with pain management (Ex. Bl8F p. 5). The claimant consulted with pain management on January 24, 2019 reporting a history of bilateral carpal tunnel release with significant improvement in her symptoms. However, she reported a recent recurrence of symptoms on the right side (Ex. Bl9F, p. 11). Previous EMG study was reviewed as being negative for radiculopathy or plexopathy and positive for mild median neuropathy (Ex. Bl9F, p. 11). Examination of her right hand showed

22

a normal range of motion, no tenderness, no boney tenderness, normal capillary refill, no deformity and no laceration. She also had normal strength but decreased sensation (Ex. Bl9F, p. 15). She was prescribed Neurontin to be taken at bedtime (Ex. Bl9F, p. 16). There are no further follow-up treatment notes for the carpal tunnel or wrist complaints.

(Tr. 25-26). An ALJ's hypothetical questions to a VE need only incorporate those limitations which the ALJ has accepted as credible. *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *9 (6th Cir. March 15, 2011); *Casey v. Secretary, HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993). Plaintiff does not dispute the evidence set forth by the ALJ to support the RFC, but essentially argues that the aforementioned NCT should be given greater weight than rest of the evidence cited by the ALJ. Even if the court could review the weight of the evidence, Plaintiff fails to explain why the RFC is at odds with this one record. Accordingly, the ALJ properly relied on the VE's testimony in response to her hypothetical question incorporating the limitations the ALJ accepted as credible.

Finally, Plaintiff states "it should be noted that based on her age, education, and work experience, and limiting Strickland to the sedentary level of exertion, and applying Grid Rule 201.14 Strickland should have been found disabled. Failure to apply the Grids was harmful error in this matter." (R. 13, Page# 1817). Although Plaintiff asserts that this argument "should be noted[,]" she fails to set forth any case law or analysis to support why it should be noted or how the ALJ committed reversible error. Accordingly, Plaintiff forfeits this underdeveloped argument. *Kennedy*, 87 Fed. Appx. 464, 2003 WL 23140056, at *1 (6th Cir. 2003).

For the above reasons, the court recommends that the second assignment of error be rejected.

## VI.    Conclusion

For the foregoing reasons, the undersigned recommends that the Commissioner's final decision be AFFIRMED.

*s/ David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: August 6, 2021

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the district court's order.  *See Berkshire v. Beauvais*, 928 F. 3d 520, 530-31 (6th Cir. 2019); *See also United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**